UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WASHINGTON

5  In re:                                      )
                                               )
6  MARSHA KAY MCMAHON-JONES and,               )   Case No.  09-017928-KAO
   TOMMY ANDREW JONES,                         )
7                                              )
                                               )
8              Debtors.                        )
   _____ )
9                                              )
   ABC SUN CONTROL, INC.,                      )   Adversary No.  09-01514-KAO
10                                             )
11             Plaintiff,                      )
                                               )
12 vs.                                         )
                                               )   DECISION
13 MARSHA KAY MCMAHON-JONES and                )
   TOMMY ANDREW JONES,                         )
14                                             )
               Defendants.                     )
15 _____ )

        This matter comes before the Court upon Plaintiff ABC Sun Control's "Complaint for Denial of Dischargeability of Debt" [AP#1].  ABC provided custom made awning and window covering materials to American Awning and Shade Inc., a business in which the Defendants Marsha K. McMahon-Jones and Tommy Jones held an interest.  In the course of the parties' dealings the Defendants guaranteed the obligation of American Awning to ABC.  American Awning went out of business leaving a substantial obligation owing to ABC.  The Defendants filed for bankruptcy relief under Chapter 7.  ABC file this adversary complaint objecting to the Defendants' discharge of their obligations to ABC pursuant to 11 U.S.C. § 523 and seeking denial of the Defendants' discharge pursuant to 11 U.S.C. § 727(a).

DECISION
July 22, 2011                           -1-

## JURISDICTION

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 157(a). This adversary proceeding is a core matter pursuant to 28 U.S.C. § 157(b)(2)(I) & (J).

## FACTS

The facts and events that are the subject of this adversary proceeding are extensive and complex. The Court in its decision will make reference to documents in the Court's main case docket (Doc ___), adversary case docket (AP ___), exhibits offered by the Plaintiff (¶ X ___), and exhibits offered by the Defendants (Δ X ___). The Court will start with a chronological review of the facts.

1. Marsha McMahon-Jones and Tommy Jones were husband and wife.

2. T. Jones Enterprises, LLC., was a Washington Limited Liability Company which was filed with the State on April 17, 2000. (¶ X23 p.3) Its governing person/member was Tommy Jones. It was engaged in the retail shade and awning business. By 2004, it was operating four Budget Blinds franchises in the Seattle area.

3. Marsha McMahon-Jones wished to go into the high end custom shade business. Tommy Jones consulted with his franchiser Budget Blinds to ensure that his wife's involvement in this custom high end business would not violate Tommy's agreement with Budget Blinds. After he received such assurances, Marsha McMahon-Jones commenced doing business under the name of American Awnings & Shade. AA&S operated out of one of the Budget Blind franchise locations. Tommy Jones, was also employed by AA&S.

4. Marsha McMahon- Jones signed an application dated July 24, 2004, seeking credit from ABC Sun Control Inc., a manufacturer of custom made to order shades and window coverings. (¶ X17). This application included a personal guarantee. Mr. Jones did not sign this application or guarantee being concerned about violating the terms of his franchise agreement with Budget Blinds. AA&S placed its first order for merchandise from ABC on August 10, 2004. (¶ X21 p. 1).

5. During the year 2004, American Awning & Shades did $64,440.00 of business with ABC.

1   At the end of 2004, AA&S owed ABC $24,674.00.

2      6. American Awnings & Shades Inc., was incorporated as a Washington Corporation filed on
3 April 22, 2005. Its president and registered agent was Marsha McMahon-Jones. (¶ X23 p.1). During
4 the year 2005, American Awning did $263,259.00 of business with ABC. At the end of 2005,
5 AA&S owed ABC $26,730.00.

6      7. During the year 2006, AA&S did $580,062.00 of business with ABC. At the end of 2006,
7 AA&S owed ABC $39,487.00.

8      8. During the year 2007, AA&S did $672,949.00 of business with ABC. During this year,
9 the Defendants and AA&S were the focus of collection activities for a substantial obligation to the
10 IRS. At the end of 2007, AA&S owed ABC $238,294.00.

11      9. ABC became concerned about the growing balance in July of 2007. ABC's president, Mr.
12 Smallwood met with the Jones during that month. After that discussion, Mr. Smallwood concluded
13 that ABC needed security for the delinquent balance.

14      10. About this time Marsha McMahon-Jones got out of the day-to-day management of
15 AA&S which was taken over by Tommy Jones. She started a career as a realtor. (¶ X20). From
16 about this time Marsha McMahon-Jones had little involvement in the operations and management of
17 AA&S.

18      11. On October 8,2007, the Jones listed their waterfront residence with relators specializing
19 in high end waterfront reality. (Δ X19). The Defendants relied upon the advice of their experienced
20 realtors in listing the residence for $2,395,000.00.

21      12. In the fall of 2007, Mr. Smallwood met with the Jones once again. At this meeting he
22 presented them with a promissory note in the sum of $230,000.00 and a deed of trust on their
23 waterfront residence securing said note. At the time of the preparation of the note and deed of trust,
24 Mr. Smallwood was aware that the residence was listed for sale at about $2,500,000.00. He had
25 visited the home and did not doubt its value. A note and deed of trust dated December 5, 2007 were
26 executed by the Jones. (¶ X18 and ¶ X19). The deed of trust was recorded on December 6, 2007.

27 DECISION
28 July 22, 2011                        -3-

1    The note by its terms provided for payment of $1,533.33 per month with balance of the note and all
2    accrued interest due in full on November 30, 2008. The note bears interest at the rate of 8%.
3    ($1,533.33 per month). Mr. Smallwood testified that it took a number of contacts with the Jones
4    before they signed the documents.

5        13. In early 2008, three of the Budget Blinds franchises were sold. The Defendants
6    deposited $215,000.00 of the purchase price in their personal account. (¶ X16 p.7). A check for
7    $100,000.00 was drawn on this account to pay off a Budget Blinds line of credit. (¶ X16 p. 8; Δ X
8    p.74). The remaining balance of the purchase price was to be paid in monthly installments of
9    $3,794.39 per month with the first installment received June 3, 2008. (Δ X11 p.74). T. Jones
10    Enterprises, LLC., was administratively dissolved on April 30, 2008. (¶ X23 p.3). There is mention
11    that the T. Jones Enterprises, LLC., was "merged" with AA&S as of June 1, 2008. (¶ X1 p.29).
12    There is no evidence that the merger was ever actually formally accomplished. Budget Blinds and
13    AA&S continued to keep separate books and records thru August 31, 2009. (Δ X 2,3,5,6,8,9,11 &
14    12). The remaining Budget Blinds franchise continued operation at the business location which it
15    shared with AA&S.

16        14. ABC continued to do business with AA&S after the execution of the note and deed of
17    trust. During the year 2008 and early 2009, ABC sold to AA&S on essentially a cash basis. During
18    the period December 18, 2007 thru April 2, 2009, ABC sold goods to AA&S invoiced at
19    $410,383.74 and received payments from AA&S of $383,387.27. Based on these figures the debt of
20    AA&S to ABC increased by the sum of $26,996.47, in the period from December 2008 to the
21    beginning of April 2009. ABC also billed 13 charges of $1,533.33, the monthly payments due per
22    the note during this period. (¶ X21 p. 33 to p. 42).

23        15. AA&S's bank account was the subject of a tax levy on April 7, 2009. (¶ X10 p. 22).
24    When AA&S's checks were not honored, ABC ceased selling goods to AA&S. (¶ X 21 p. 42).

25        16. AA&S was administratively dissolved by the State of Washington on April 30, 2009. (¶
26    X 23 p.1).

27    DECISION
28    July 22, 2011                -4-

1    17. Awnings by Design, LLC., was filed with the State of Washington on April 30, 2009. Its

2    governing member and registered agent was Tommy Jones. Awnings by Design engaged in

3    essentially the same business as AA&S and operated in the AA&S location. Awnings by Design was

4    administratively dissolved by the State on April 30, 2010. (¶ X23 p.2). Tommy Jones continued

5    conducting this business at the same location under the name Awnings by Design to the time of the

6    trial of this matter. (¶ X 23 p.2).

7    18. On August 6, 2009, Marsha Kay McMahon-Jones and Tommy Andrew Jones filed for

8    relief under chapter 7 of the Bankruptcy Code.

9    19. ABC filed this adversary proceeding objecting to discharge of Defendants' obligations to

10   ABC and objecting to the granting to the Defendants of a discharge in this case.

11                                   **DISCUSSION**

12   I.    11 U.S.C. §523(a)(2)(A)

13   ABC bases a cause of action against the Defendants on 11 U.S.C. § 523(a)(2)(A). It alleges

14   that the Defendants' obligation to it was as a result of "false pretenses, a false representation, or

15   actual fraud." This breaks down into two allegations: (1) the Defendants' purchased goods from

16   ABC with no intention to pay and; (2) that ABC's decision to refinance was induced by Defendants'

17   fraud.

18   A.    Incurring Debt With No Intent to Pay

19   The Defendants wanted to start a business selling custom shades and window coverings.

20   Because of potential problems with an existing franchiser, Marsha McMahon-Jones was to be the

21   owner of the business. Tommy Jones, who was involved in the business as well, negotiated a deal

22   with ABC to manufacture product for the new business. ABC required that Marsha McMahon-Jones

23   sign a guarantee of the obligations to ABC. Purchases began in August 2004. Marsha operated

24   under the name American Awnings & Shade for a period of time prior to its incorporation on April

25   22, 2005.

26   AA&S dealings with ABC were within acceptable debt limits for the years 2004 thru 2006.

27   DECISION

28   July 22, 2011                                    -5-

1   AA&S began having trouble paying its obligations in 2007. The Defendants were dealing with a

2   substantial IRS obligation by the end of June 2007. AA&S' balance payable to ABC had risen to

3   over $200,000.00. ABC's President, Mr. Smallwood was nervous about the growing payable. Mr.

4   Smallwood met with the Defendants and had a number of other contacts with them attempting to

5   collateralize AA&S's debt to ABC. On December 5, 2007, the Defendants signed a $230,000.00

6   note and deed of trust on their residence, collateralizing the outstanding balance owed to ABC.

7   AA&S had done $672,949.00 of business with ABC during 2007.

8       In the period December 2007 to April 2009, the pattern of dealings between AA&S and

9   ABC, suggest a cash in advance practice. A review of the parties transactions from that period

10   indicates purchases of $410,383.74 with payments by AA&S of $383,387.27, purchases exceeding

11   payments by $26,996.47. Although the account receivable balance on ABC's books increased more

12   than that amount that is the result of interest/note payments added to the account. ABC terminated

13   its sales to AA&S when a number of checks were returned. This coincided with a tax levy made on

14   the AA&S bank account.

15       The dealings between the Defendants, AA&S and ABC for the periods 2004 thru 2006, and

16   December 2007 thru April 2009, do not support ABC's allegation that these debts were incurred with

17   no intention of repayment.

18       The increase of the AA&S account payable balance during the year 2007, coincide with the

19   Defendants' IRS problems and the beginning of a general economic downturn. Upon ABC's

20   request, the Defendants collateralized the obligation and entered into terms to satisfy it. The

21   Defendants' performance post December 2007 supports their position that they were attempting to

22   continue business operations and satisfy their obligations to ABC. Their failure in that regard is

23   attributable to poor business judgment, poor personal judgment and adverse economic conditions,

24   rather than fraudulent intent. The Plaintiff has not met its burden of proof on its contention that the

25   Defendants incurred debt to ABC without intent to pay.

26       B.    Refinance Based on Defendants' Fraud

27   DECISION

28   July 22, 2011                      -6-

1         1.    <u>Misrepresentation of the Value of Collateral</u>

2     ABC argues when it accepted the Defendants' 12/5/07 note and mortgage, it relied upon the

3 Defendants' knowingly false representations as to the value of their residence.

4       ABC became concerned about AA&S's large account payable by July of 2007, when

5 Mr. Smallwood visited with the Defendants about the outstanding obligation. Mr. Smallwood

6 concluded that ABC needed additional collateral to insure payment.

7     At about this time the Defendants were considering listing their residence for sale. The Jones

8 sought the expertise of two experienced realtors specializing in high end waterfront homes. Relying

9 on their realtors' analysis, the Defendants' residence was ultimately listed for sale at a price of

10 $2,395,000.00 in the fall of 2007. (Δ X19). A price that the Defendants believed was reasonable in

11 light of the then current real estate market.

12     Mr. Smallwood, who was evidently aware of the listing, requested the Defendants sign a note

13 and deed of trust on their residence to secure ABC's obligation. Mr. Smallwood had previously

14 visited the Defendants' home and did not find the listing price unreasonable. After some delay, on

15 December 5, 2007, the Defendants ultimately decided to sign the note and mortgage presented to

16 them by ABC's lawyer.

17     The Defendants' listed their residence at an asking price of $2,395,000.00 in reasonable

18 reliance upon the expert advice of their relators. They believed that was a reasonable value at the

19 time of their listing the property. In early 2008, the relators advised that in light of the dramatic

20 downturn in the real estate market the home should be removed from the market. Accepting this

21 advice the Defendants cancelled their listing.

22     The Defendants did not intentionally misrepresent the value of their home to ABC nor did

23 they improperly remove the property from the market.

24         2.    <u>Representation that ABC Would be Paid From the Proceeds of the Sale of the</u>

25               <u>Budget Blinds Franchise</u>

26     ABC also contends in support of its § 523(a)(2)(A) contentions, that the Defendants should

27 DECISION

28 July 22, 2011                          -7-

1 | have used the proceeds of the sale of the Budget Blinds franchises to payoff ABC.

2 | The Budget Blinds franchises were operated by T. Jones Enterprises, LLC., doing business as
3 | Budget Blinds of Seattle & the Eastside. Budget Blinds did not owe anything to ABC nor was ABC
4 | granted a security interest in the franchises. Budget Blinds' December 31, 2007, balance sheet
5 | reveals that it was hopelessly insolvent, with total liabilities of $579,702.11, greatly exceeding its
6 | $81,371.52 of total assets. (Δ X p.1).

7 | Mr. Smallwood testified that the Defendants had promised to use the franchise proceeds to
8 | pay ABC. The Jones denied making any such promise. The existence of such a promise has not
9 | been proved.

10 | ABC has failed to meet its burden of proof on its § 523(a)(2)(A) contentions.

11 | II. 11 U.S.C. § 523(a)(4)

12 | ABC bases one count of its complaint against the Defendants on §523(a)(4). This provision
13 | bars discharge of a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement
14 | or larceny;" ABC alleges the Defendants breached their fiduciary duties as corporate officers and
15 | employees of AA&S, by taking excess compensation, paying personal expenses with corporate
16 | funds, and preferring creditors while AA&S was insolvent.

17 | A. Were Defendants "Fiduciaries?"

18 | The Court must examine the definition of fiduciary in § 523(a)(4). "...[T]he broad general
19 | definition of fiduciary relationship involving confidence, trust and good faith is inapplicable in the
20 | dischargeability content, ordinary commercial relationships are excluded from the reach of §
21 | 523(a)(4)." In re Short, 818 F.2d 693, 695 (9th Cir. 1987). The term "fiduciary" as used in §
22 | 523(a)(4) is a question of federal law and is narrowly construed. In re Kallmeyer, 242 B.R. 492, 495
23 | (9th Cir. BAP 1999); Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986). Only the fiduciary
24 | duties of a trustee fall within § 523(a)(4). In re Hultquist, 101 B.R. 180, 185 (9th Cir. BAP 1989),
25 | where the Court, applying Washington law, found that although the debtor as a corporate officer
26 | owed a general fiduciary duty, § 523(a)(4) was not applicable to his actions because there was no

27 | DECISION
28 | July 22, 2011 -8-

trust. Corporate officers' fiduciary duties are that of an agent, rather than that of a trustee of corporate assets. In re Cantrell, 329 F.3d 1119, 1127 (9th Cir. 2003); In re Honkanen, 446 B.R. 373 (9th Cir. BAP 2011); In re Gray, (9th Cir. BAP No. AZ-10-1304-MkMaD 07/07/11). Inclusion within the term "acting in a fiduciary capacity" requires a finding that one is a trustee of a trust, "express" or "statutory," Hultquist, 101 B.R. at 185, or by common law rule. Kallmeyer, 242 B.R. at 496. All the above authorities agreed that state law is determinative as to whether corporate fiduciary duties are those of a trustee.

ABC must show as a condition requisite to prevailing under § 523(a)(4) that the Defendants violated their fiduciary duties as a trustee under Washington law.

B.     Is There a Trust?

The evidence does not support the existence of either an express trust nor a trust created by statute. ABC contends that a trust exists under the common law trust fund doctrine.

1.     The Trust Fund Doctrine- General

The Court starts its discussion of this topic with references to the authoritative treatise, 15A William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations (2011), which provides:

§ 7369 The trust fund doctrine in general

Perhaps no concept has created as much confusion in the field of corporate law as has the "trust fund doctrine." A number of cases have stated that under the trust fund doctrine, the capital stock of a corporation, or the assets of an insolvent corporation representing its capital stock, is a trust fund for the benefit of the corporation's creditors.

The doctrine has been widely criticized and, as defined above, has been repudiated. In no case applying the doctrine has an actual trust ever been impressed upon the specific assets of either a solvent or an insolvent corporation,

...

The theory of the trust fund doctrine is that all of the assets of a corporation, immediately on its becoming insolvent, exists for the benefit of all of its creditors and that thereafter no liens or rights can be created either voluntarily or by operation of law whereby one creditor is given an advantage over others.

DECISION

July 22, 2011                                                                -9-

Fletcher notes the doctrine is applied after a court of equity has taken jurisdiction of the property.

§7373 Modern Status of trust fund doctrine

> Courts have noted that the trust fund doctrine is rather a trust in the administration of the assets after possession by a court of equity than a trust attaching to the property, as such, for the direct benefit of either creditor or stockholder.

2.   Washington's "Trust Fund Doctrine"

The "trust fund doctrine" was first articulated by a Washington court in the case of Thompson v. Huron Lumber Co., 4 Wash. 600, 30 P.741 (1892). In Thompson, the receiver of an insolvent corporation sought to set aside a preferential mortgage given just weeks before the initiation of the receivership. The holder of the mortgage argued it was permissible for insolvent corporations to make preferences. The court in voiding the mortgage said in part, "But we cannot lose sight of the settled rule concerning the property of insolvent corporations, that it is a trust fund for creditors,..." 4 Wash. at 604-605, 30 P. at 742. This ruling became the law of the State of Washington as articulated in Benner v. Scandiavian American Bank, 73 Wash. 488, 497, 131 P. 1149, 1152 (1913);

> In this state it is the rule that a domestic corporation cannot after insolvency prefer its creditors; but, on the contrary, its property is from thenceforth regarded as a trust fund for the benefit of all its creditors, and any transfers or mortgages thereof after insolvency, which have the effect of preferring one creditor over another, are void.

This trust fund doctrine was not part of the common law of England but nevertheless became the common law of Washington. Sterrett v. White Pine Sash Co., 176 Wash. 663, 665, 30 P.2d 665, 667 (1934). The Doctrine as articulated made good faith and lack of knowledge of insolvency immaterial to recovery of preferences. Ibid.

3.   Statutory Modification of the Trust Fund Doctrine

This broad application of the "trust fund doctrine" began to be limited by legislation in

DECISION

July 22, 2011                                        -10-

1  important ways.  The Washington Laws of 1931, c. 47 p. 160, limited the time in which a receiver

2  could bring a preference action to 6 months post appointment, it limited the preferences recoverable

3  to those which occurred within 4 months prior to the appointment of the receiver, and it required

4  proof that the recipient had reasonable cause to believe it was receiving a preference.  If the transfer

5  met these criteria the resulting preference was <u>voidable</u> by the receiver.

6      In 1941, the Legislature once again visited this area and specifically made reference to the

7  trust fund doctrine when it enacted RCW 23.72.030 (Laws of 1941, Ch 103) which provided:

8      Any preference made or suffered within four months before the date of application for
       the appointment of a receiver may be avoided and the property or its value recovered
9      by such a receiver, if the person receiving the preference or to be benefitted thereby or
       his agent acting therein shall then have reasonable cause to believe that the debtor
10     corporation is insolvent.  No preference made or suffered prior to such four months'
       period may be recovered, and <u>all provisions of law or of the trust fund doctrine</u>
11     <u>permitting recovery of any preference made beyond such four months' period are</u>
       <u>hereby specifically superseded.</u> (emphasis added)

12

13  The court in <u>Block v. Olympic Health Spa, Inc.</u>, 24 Wash.App 938, 950 FN 5, 604 P.2d 1317, 1324

14  FN5, (1979) said the trust fund doctrine had been abrogated.

15      ABC argues that RCW 23.72.030 has been repealed by the Laws of 2004 ch. 165, therefore

16  the Washington common law trust fund doctrine was reinstated as the law of the state.  The two

17  Washington Courts that have referenced this argument are inconclusive.  <u>In re Underwood</u>, 2004 WL

18  5607954 (Bkry E.D.WA 2004); <u>GMAC, LLC v. Hiatt Pontiac GMC Trucks Inc.</u>, 2009 WL 4730838

19  (Dist. Ct. W.D. WA 2009).

20      The legislation relied upon by ABC was part of a comprehensive rewriting of the Washington

21  Receivership Statues.  The Court will examine the implications of that legislation for the trust fund

22  doctrine.

23      4.    The 2004 Receivership Legislation

24      The repeal of RCW 23.72.030 is part of Chapter 165 of the Laws of 2004, which rewrote the

25  Washington Receivership Statute RCW 7.60.005.300.  As a result of Chapter 165 and its repeal of

26  RCW 23.72.030 there is no statutory basis for receivers of insolvent corporations to recover

27  DECISION

28  July 22, 2011                                    -11-

1   preferences. Did the Legislature thereby intend to eliminate recovery of corporate preferences under

2   state law entirely or did they intend to dramatically expand their use by returning to Washington's

3   common law trust fund doctrine as it existed prior to 1931?

4     The trust fund doctrine in Washington arose out of the desire by the courts to provide the

5   receiver of an insolvent corporation means by which transfers which benefitted one party to the

6   detriment of the remaining creditors could be recovered and distributed equitably. It did this by

7   declaring that the corporate officers become trustees of the corporate assets when the corporation

8   became insolvent. Transfers made in violation of the trust were void. The common law provided no

9   defense to the receivers actions either in timeliness or the good faith of the recipient. This created

10  injustices which the Legislature sought to remedy by limiting the harsh results of the common law

11  rule. Accordingly in 1931 the preference law was greatly limited by providing time limitations and a

12  good faith defense. Preferences became voidable as opposed to void. Preferences even to corporate

13  officers could be upheld by the courts if they could withstand close scrutiny as fair and equitable.

14  GMAC v. Hiatt; 2009 WL 4730838; Block v. Olympic Health Spa, 24 Wash at 948-49, 604 P.2d at

15  1124-25; Tacoma Ass'n of Credit Men v. Lester, 72 Wash.2d 453, 433 P.2d 901 (1967). The law

16  thus became cognizant of these economic realities and softened the harsh consequences of the rule.

17  Is it likely that Legislature intended to return to the harsh rule applicable a century ago when it

18  repealed the corporate preference law as it revised the Receivership Statute?

19    The Receivership Statute was revised to encourage the use of state court receiverships.

20  Secured creditors will now commonly seek to place a debtor in receivership so that they may use that

21  forum to safely conduct realization on their collateral under the supervision of a court. The

22  receivership now operates under specific statutory authority in areas which were previously

23  undefined. As an incentive to make the Receivership Statute more attractive to secured creditors, the

24  legislature repealed the corporate preference provision, which were often a disincentive for the

25  secured creditor to institute a receivership as a result of the adverse impact the preference provisions

26  might have on its position. Return to the harsh common law rule would be a great disincentive for

27  DECISION

28  July 22, 2011       -12-

1  use of the Receivership Statute by secured creditors. One suspects this would be a great surprise to

2  the people that proposed the legislation and the legislature that passed it.

3      The Court must consider whether this rather illogical interpretation is consistent with the

4  other provisions of Washington's corporate law.

5          5.    Washington's Corporate Statutory Scheme

6      Washington has over the years enacted comprehensive legislation on the subject of

7  corporations.

8      In 1965, the Washington legislature adopted the Washington Business Corporations
   Act (WBCA), Laws of 1965, ch. 53, which was based largely on the national Model
9  Business Corporation Act.

10     In 1984, the national Model Business Corporation Act was revised in response to
   extensive comment throughout the country. In 1989, the Washington legislature
11 substantially revised the WBCA, Laws of 1989, ch. 165, to incorporate many
   provisions of the national 1984 Revised Model Business Corporation Act (Model
12 Act).

13
   Ballard Square Condominium Owners Ass'n v. Dynasty Const. Co., 158 Wash. 2d 603, 620-621,
14

15 146 P.3d 914, 923 (2006).

16
     One must look to the extent the statutory provisions interpret the common law.
17

18     A statute abrogates the common law if the provisions of the statute are so inconsistent
   with and repugnant to the common law that both cannot simultaneously be in force.
19 *State ex rel. Madden v. Pub. Util. Dist.,* 83 Wash.2d 219, 222, 517 P.2d 585 (1973).
   "It is a general rule of interpretation to assume that the legislature was aware of the
20 established common-law rules applicable to the subject matter of the statute when it
   was enacted." *Id.* "A statute which is clearly designed as a substitute for the prior
21 common**924 law must be given effect." *Id.* at 221, 517 P.2d 585. However,
   "'[a]bsent an indication that the Legislature intended to overrule the common law,
22 new legislation will be presumed to be consistent with prior judicial decisions.'"
   *Ballard Sq. Condo. v. Dynasty Constr.,* 126 Wash.App. 285, 295-96 & n. 39, 108
23 P.3d 818 (2005) (quoting *In re Marriage of Williams,* 115 Wash.2d 202, 208, 796
   P.2d 421 (1990)).
24
   Ibid.
25
     Applying these principles we look to the relevant corporate statute, in this case RCW 23
26

27 DECISION

28 July 22, 2011                    -13-

B.14.050 **Effects of Dissolution** which provides in part:

   (1) A dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs, including:
   (a) Collecting assets;
   (b) Disposing of its properties that will be applied toward satisfaction or making reasonable provision for satisfaction of its liabilities or will otherwise not be distributed in kind to its shareholders, but in any case subject to applicable liens and security interests as well as any applicable contractual restrictions on the disposition of its properties;
   (c) Satisfying or making reasonable provision for satisfying its liabilities, in accordance with their priorities as established by law, and on a pro rata basis within each class of liabilities;
   (d) Subject to the limitations imposed by RCW 23B.06.400, distributing its remaining property among its shareholders according to their interests; and
   (e) Doing every other act necessary to wind up and liquidate its business and affairs.
   (2) Except as otherwise provided in this chapter, <u>dissolution of a corporation does not;</u>
   (a) <u>Transfer title to the corporation's property;</u>
   (b) Prevent transfer of its shares or securities, although the authorization to dissolve may provide for closing the corporation's share transfer records;
   (c) <u>Subject its directors or officers to standards of conduct different from those prescribed in chapter 23B.08.RCW;</u>
   (d) Change quorum or voting requirements for its board of directors or shareholders; change provisions for selection, resignation, or removal of its directors or officers or both; or change provisions for amending its bylaws;
   (e) Prevent commencement of a proceeding by or against the corporation in its corporate name;
   (f) Abate or suspend a proceeding pending by or against the corporation on the effective date of dissolution; or
   (g) Terminate the authority of the registered agent of the corporation.

•••

(emphasis added)

   The above underscored provisions are inconsistent with the common law trust fund doctrine. Section (2)(a) provides that there is no transfer of title of the corporation property. The corporation property remains its own, not transferred into a trust. Even more convincingly, section (2)(c) provides that the duties of its directors and officers remain those designated in 23B.08 RCW. These duties are not the enhanced duties of a trustee. The Washington Supreme Court recognized the statute is inconsistent with the common law trust fund doctrine in <u>Ballard Square</u>

•••

DECISION

July 22, 2011                                        -14-

The Official Comments to chapter 23B.14 RCW at the time of enactment explain that RCW 23B.14.050(2) makes clear that

> chapter 14 dissolution does not have any of the characteristics of common law dissolution, which treated corporate dissolution as analogous to the death of a natural person and abated lawsuits, vested equitable title to corporate property in the shareholders, imposed the fiduciary duty of the trustees on the directors, who had custody of corporate assets, and revoked the authority of the registered agent. [RCW 23B.14.050(2)] expressly reverses all these common law attributes of dissolution and makes clear that the rights, powers, and duties of shareholders, the directors, and the registered agent are not affected at dissolution and that suits by or against the corporation are not affected in any way.

Senate Journal, 51st Leg., Reg. Sess., app. At 3095 (Wash.1989).

Ballard Square, 158 Wash. 2d at 615, 146 P.3d at 920. The legislative history of RCW 23B.14.050 confirms the abolition of the common law trust fund doctrine by the statute.

ABC has failed to prove that the Defendants were fiduciaries under § 523(a)(4). The Defendants were not "trustees," a prerequisite for violation of the statute. ABC has failed to prove its claim under § 523(a)(4).

III.     11 U.S.C. § 523 (a)(6)

ABC bases a cause of action on 11 U.S.C. § 523(a)(6), alleging that the Defendants willfully and maliciously injured ABC. The leading case applying § 523(a)(6) requires the claimant to prove the actions complained were "acts done with actual intent to cause injury." Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998). ABC must prove that the Defendants actually intended to harm ABC by their actions or that their actions were objectively certain to harm ABC. Miller v. J.D. Abrams, Inc. (In re Miller), 156 F.3d 598, 606 (5th Cir. 1998).

ABC cites a litany of Defendants' actions which it contends supports its allegations under § 523(a)(6). The Court has already discussed at some length ABC's allegations that the Defendants incurred debt to ABC with no intention to pay. If proven these allegations might qualify under §523(a)(6)(A). However, ABC has not proven that the Defendants incurred debt with no intention to pay.

ABC also cites dealings between South Park Holding, Ripley Lane, American Awning and

DECISION

July 22, 2011                                     -15-

the Defendants as grounds for relief under §523(a)(6). It appears that South Park Holding and Ripley Lane d/b/a Closet Tailors, were limited liability companies in which Marsha McMahon Jones' father held some interest. Based on the Moss Adams notes (¶ X 1 p.19), it appears that a note payable to South Park by the Defendants was distributed to McMahons, and then gifted by them to the Jones as part of the liquidation of South Park. Ripley Lane d/b/c Closet Tailors was also being liquidated about this time. American Awning wrote off a $55,000.00 debt from Ripley Lane/Closet Tailors. There is no evidence that this receivable from Closet Tailors, which was going out of business, was collectible. There is no evidence to support the allegations that these actions were taken to intentionally harm ABC or that the natural consequences of the actions were certain to harm ABC.

Likewise ABC alleges that American Awning made loans to Budget Blinds which were not paid back. Admittedly these may have been unwise loans. Budget Blinds' balance sheet of December 31, 2007 discloses assets of $81,371.52 with liabilities of $579,702.11. Unwise loans to Budget Blinds do not equate with actions taken with the intent to harm ABC. Budget Blinds owed nothing to ABC. The use of the proceeds from the sale of the three Budget Blinds franchises to pay other creditors of Budget Blinds does not support ABC allegations.

ABC placed much emphasis on the fact that Marsha McMahon-Jones is well educated, having received a MBA from a prestigious university. She was successful when working for a number of large companies in the field of marketing and advertising and therefore ABC argues she and her husband were knowledgeable and their business failures were part of a coordinated scheme to cheat ABC. Unfortunately the recipients of MBA degrees are not necessarily endowed with wise business judgment, the ability to manage organizations or the ability to keep coherent business records pristine in observance of the tax code. If they were, our country would not be in the present economic mess. The Defendants' failure of business judgment in trying to keep their high end business afloat in a collapsing economy do not equate as acts taken with the intention to harm ABC and their other creditors. Rather Defendants appear as people desperately attempting to salvage their business and meet their numerous obligations. Unfortunately that is not always possible.

DECISION

July 22, 2011                                        -16-

1    The Plaintiff has not proven its allegations that the Defendants intentionally harmed ABC in

2    violation of § 523(a)(6).

3    IV.    11 U.S.C. § 727(a)(2)(A)

4    ABC seeks to bar the Defendants' discharge relying on 11 U.S.C. § 727(a)(2)(A). ABC

5    alleges that the Defendants, with intent to hinder, delay, or defraud ABC or the bankruptcy estate,

6    transferred or concealed Defendants' property within a year of their bankruptcy. As support of its

7    allegations, ABC relies on two checks drawn on AA&S's bank account and made payable to

8    Awnings By Design, one check for $10,000.00 on 6/9/09 and a second check for $5,000.00 on

9    7/9/09. The problem with this allegation is that the monies transferred were the property of AA&S,

10   the corporation, and not the property of the Defendants.

11   The Plaintiff in its approach to this case has treated Defendants' various business enterprises

12   as extensions of the Defendants themselves. It thus characterizes a transfer of AA&S's assets as a

13   transfer of Defendants' property. By implication ABC argues that the Court should disregard the

14   various different legal entities in which the Defendants have an interest while not specifically calling

15   for the Court to pierce the various corporate veils. The Court will examine the factual history of the

16   Defendants' various enterprises to assist analysis of this position.

17   T. Jones Enterprises, LLC., (TJE) was a Washington Limited Liability Company initially

18   filed with the state in 2000. Debtor Tommy Jones was the governing member. TJE was in the retail

19   shades and awning business and operated Budget Blind franchises at four different locations.

20   Marsha McMahon-Jones started a companion business specializing in custom shades and awnings

21   under the name American Awning and Shade. This business was incorporated in 2005. AA&S

22   operated its business out of one of the Budget Blind locations. Besides sharing locations they

23   occasionally shared in the use of employees and equipment. They kept separate books and bank

24   accounts. Tommy Jones provided operational assistance to AA&S while Marsha McMahon-Jones

25   focused on sales, her area of expertise. Both AA&S and the Budget Blinds operations ran into

26   economic difficulties in 2007.

27   DECISION

28   July 22, 2011                                    -17-

1  These difficulties produced a change in the operation of the two entities. In the summer of
2  2007, Marsha McMahon-Jones left active participation in the day to day business of AA&S to start a
3  career as a realtor. Tommy Jones continued to run AA&S and the Budget Blind franchises. In the
4  beginning of 2008, three of the franchises were sold. In April 2008, T. Jones Enterprises, LLC., was
5  administratively dissolved. There is a suggestion in the working paper of Moss Adams that the
6  remaining Budget Blind franchise was to have merged into AA&S. (¶ X 1 p.29). There is no
7  evidence that this ever formally accomplished. However, AA&S and the remaining Budget Blind
8  franchise continued to operate out of the remaining location. AA&S and Budget Blinds continued to
9  have separate books and bank accounts.

10  In April of 2009, the State Department of Revenue placed a levy on AA&S's bank account,
11  AA&S's checks to ABC bounced, ABC quit supplying AA&S, and AA&S was administratively
12  dissolved. Budget Blinds continued to operate at the franchise location.

13  On April 30, 2009, Awnings By Design, LLC., (ABD), was filed with the State. It
14  commenced doing a custom window covering business in the Budget Blinds location. Tommy Jones
15  testified that because of difficulties involved in opening a bank account for ABD, for a time ABD
16  used AA&S's bank account to operate its business. Ultimately Tommy Jones transferred $10,000.00
17  out of the AA&S account to start an account for ABD. Subsequently another $5,000.00 was
18  transferred from the AA&S account to ABD. It is these transfers that ABC complains of in support
19  of their complaint. It is unclear whether this $15,000.00 was the product of ABD's business
20  activities or was from AA&S operations.

21  ABC argues that these dealings between the corporation AA&S and the limited liability
22  companies evidence a scheme to hide assets in hindrance of Defendants' creditors. Defendants
23  failure to strictly comply with statutes concerning orderly winding down of dissolved entities is not
24  commendable. Yet pristine compliance with those dissolution procedures is seldom found in the real
25  world. Those procedures are costly. The dissolved entities liabilities greatly exceeded their limited
26  assets which were not very liquid. The Defendants, with their own financial problems could ill

27  DECISION
28  July 22, 2011                                           -18-

afford to finance the liquidation. The whole point of limited liability for failed business entities would be lost if the officer, directors and owners had to individually finance the dissolution. The Defendants had to live and they chose to try to continue in the shade and awning business in which they were familiar and which hopefully might supply a living.

ABC sees Defendants' actions as evidence of intent to hinder, delay and defraud their creditors and conceal their assets. The more probable explanation is that the Defendants were simply doing the best that they could to survive in difficult times. The evidence fails to show the requisite intent to support a violation of § 727(a)(2)(A), nor does it show that the property transferred was the property of the Defendants.

ABC also alleges Defendants had substantial assets in ABD and Budget Blinds which were not disclosed to the Court.

The Defendants' bankruptcy schedules in Schedule B disclose an interest in "Awnings by Design NW, LLC., start up company in 5/2009," which is valued at $10,000.00. (¶ X 22 p.12). The Defendants also list "Budget Blinds Inc., Debtor is franchisee. Debts exceed assets" and value this asset as "$0.00." (¶ X 22 p.13).

ABC asserts that the "Debtors have substantial assets in the business of Awnings By Design and Budget Blinds that have not been disclosed to the Court." (Doc. 26 pg. 20). ABC alleges that Defendants have substantially undervalued the assets of these companies including their customer lists and intellectual property.

ABC has provided no evidence to support these allegations. Budget Blinds' balance sheet of 12/31/2008 shows assets of $9,268.01 liabilities of $59,797.17. (Δ X 11 p.1). Budget Blinds' balance sheet of 8/31/09, the month Defendants filed bankruptcy shows assets of $12,877.11 and liabilities of $47,982.06. (Δ X 12 p.1). Nor has ABC provided evidence as to actual value of the allegedly undervalued customer lists and intellectual property.

The evidence before the Court does not support ABC's allegation against Defendants based on § 727(a)(2)(A).

DECISION
July 22, 2011                                                      -19-

## V.   11 U.S.C. § 727(a)(3)

ABC bases its next cause of action on 11 U.S.C. § 727(a)(3), alleging Defendants concealed or failed to keep books and records from which their financial condition might be ascertained.

The tenor of ABC's complaint, as most recently articulated in its post hearing brief (Dec 26 p.20-27), is that the Defendants were slow and not forth right in responding to Plaintiffs discovery requests and their actions amount to intentional concealment. If proved, such action might support Plaintiff's complaint.

ABC complains that the Defendants did not produce all of the documents requested at their 11/4/09 2004 examination, that every other page was omitted from the Defendants' personal bank statements, when this was remedied, the Defendants failed to provide copies of their personal bank statements for the months of March, April and May 2008, failed to adequately answer Plaintiff's August 10, 2010 interrogatories, and failed to timely produce bank records for AA&S and T. Jones Enterprises, LLC. (Budget Blinds), failed to produce the Moss Adams working papers related to the Defendants and to provide timely access to Defendants' computers. ABC alleges that these failures by Defendants constitute evidence of Defendants' intentional actions to conceal information regarding their financial condition in violation of §727(a)(3).

Defendants respond that they thought they had produced everything requested, when advised of the missing papers they inadvertently missed in copying they produced them, the bank statements for the three months were inadvertently missed and ultimately supplied, the records of AA&S and Budget Blinds were made available by providing access to the applicable computer and delay in doing so was lack of competence to unlock the materials stored on the computer. They note that all this information was provided to the Plaintiff prior to the time of trial. Defendants contend that they in good faith attempted to comply with the discovery requests and the difficulties encountered were unintentional and innocent on their part.

ABC's above set out grievances are discovery complaints. The Federal Rules of Civil Procedure Rules 26 thru 37 provides for the handling of discovery disputes. These disputes are

DECISION

July 22, 2011                              -20-

generally best handled in the pretrial period as opposed asserted at time of trial. This gives the trial court the option of compelling compliance with the discovery rules, and fashioning any sanctions so as to appropriately remedy the breach. The Plaintiff has not availed itself of the opportunity to deal with these discovery matters pursuant to discovery rules. Rather it attempts to convert alleged procedural discovery infractions into statutory violations of § 727(a)(3) and bar Defendants' discharge. Although that might be appropriate in some circumstances, it fails in the circumstances of this case.

The relevant information sought was provided in sufficient time prior to the trial to allow the Plaintiff to prepare its case, admittedly causing some stress and hardship in the process but not significantly restricting Plaintiff's ability to prove its case. The Defendants' explanations of the reasons for their tardy performance are more probable than Plaintiff's contention Defendants' performance is the result of intentional stonewalling. A review of the parties email correspondence on the matters (¶ X 29) reveals the typical difficulties of parties attempting to comply with discovery requests. It does not support a finding of intentional noncompliance by the Defendants.

ABC has failed to prove that the Defendants have concealed or falsified their books in violation of § 727(a)(3).[1]

VI.     11 U.S.C. § 727(a)(4)(A)

ABC bases its final cause of action on 11 U.S.C. § 727(a)(4), alleging Defendants knowingly and fraudulently made a false oath or account in connection with the case. It alleges that the Defendants' income figures reported in their "Statement of Financial Affairs," (SOFA) (¶ X 22

---

[1]In support of its § 727(a)(3) allegations, ABC also challenged the accuracy of AA&S' and Budget Blinds' books. It asserts that the payment of some of the Defendants' personal expenses by AA&S and Budget Blinds should have characterized as personal income of the Defendants rather than as reimbursement for business expenses. These allegations will be treated in the next section of this opinion dealing with § 727(a)(4).

DECISION

July 22, 2011                                        -21-

p.49), and in their "Statement of Monthly Income," (SOMI) (¶ X 22 p.62), are fraudulently false.

A. SOFA 2007 and 2008 Figures

The figures included in the Defendants' SOFA match the exact numbers reported for 2007 and 2008 in the books of AA&S (Δ X 4 p.1 & p.36, Δ X 5 p.1 & p.29) and of Budget Blinds (Δ X 7 p.1 & p. 63; Δ X 8 p.1 & p.24). The Plaintiff argues these figures should be higher , because income was improperly characterized as reimbursement of business expense. This argument is based on the testimony of Mr. Hutching, an accountant. The Defendants dispute his analysis claiming that the characterization as reimbursement of business expenses was proper. This is a legitimate dispute between the parties. It does not support the Plaintiff's position that the Defendants fraudulently misrepresented these numbers.

B. Defendants' SOFA 2009 Figures

1. Budget Blinds

The evidence concerning the 2009 Budget Blinds figures present a different case. The Defendants' figures do not exactly coincide with the figures contained in the Budget Blinds' books.

Defendants' "Statement of Financial Affairs" (SOFA) disclosed the Defendants received $14,700.00 from Budget Blinds in the period January 2009 thru July 31, 2009. (¶ X 22 p.49). Budget Blinds' "Profit and Loss Detail" for January 2009 thru August 2009, reflects $11,700.00 paid to Marsha McMahon-Jones under the category "Owner's Draw." (Δ X 9 p. 10). This same document reflects a number of deductions to this accounting category identified as "offsets..." The result is that as of the end of the period the "Owner's Draw" account showed a negative balance of "-1893.12." Budget Blinds' "Balance Sheet Detail" for the same period shows withdraws designated as "Owner's Draws" totally $13,500.00 (Δ X 12 pgs. 1-9). Neither the Budget Blinds Profit and Loss Figures nor its Balance Sheet agree with the Defendants' SOFA figure, yet the Court can not find that this is the result of fraudulent misstatement.

2. American Awnings and Shade

The Defendants' SOFA discloses Defendants' income from AA&S for the period January

DECISION

July 22, 2011                                              -22-

1  2009 thru July 31, 2009, at $16,476.69. (¶ X 22 p.49). AA&S' "Profit & Loss" and "Profit and Loss

2  Detail" show "owner's draws" for the period of $61,369.88. (Δ X 6 p.1 & p.12). These figures

3  differ from the figures in the SOFA.

4        AA&S "Profit & Loss Detail" dealing with the period January through August 2009 is a

5  confusing document. (Δ X 6 p.11-12). It is clear that the Defendants did not have access to it when

6  they were preparing their bankruptcy. The document refers to the transactions which took place after

7  August 6, 2009, the date Defendants filed the SOFA along with their other initial bankruptcy

8  pleadings. It bears the notation "8:20pm 01/23/11," presumably referring to the date it was prepared.

9        The information contained in the "Profit & Loss Detail" is also confusing. It references

10  checks to Marsha McMahon-Jones in the period of January 14, 2009, through June 10, 2009, of

11  $41,395.00, including an item dated June 10, 2009, for $2000.00 with the memo entry "void." It

12  also contains June 9, 2009, to Tommy Jones for $10,000.00 with the memo entry "open abd acc..."

13  Arguably this references money which was generated by the operations of Awning By Design since

14  April 30, 2009, and which accumulated in the AA&S account prior to opening of ABD's own

15  account. The Detail also includes numerous adjustments to this "owner draw" account marked

16  "offset to mov..." and "Accounts Rec..." which reduced the balance in "owner's draw" account.

17  This balance was enhanced by an entry with the memo notations "adj for xfr of c..." and "Capital

18  Stock" 77,386.95 and another in the 34,754.98 with notations "adj for xfrs fr..." and "Capital Stock."

19  As a result of these last referenced entries the "owner's draw" account showed a positive balance of

20  $61,369.88. But for those entries the account would have shown a negative balance in the range of

21  $51,000.00. ABC would have the Court simply consider the withdrawals as Defendants' income and

22  disregard all of the negative adjustments to the account. The Court declines to do this.

23        AA&S accounting during the last months of its existence is understandably chaotic. AA&S

24  suffered a tax levy on its bank account, it lost its principal supplier, it was administratively dissolved

25  by the State and its bank account was used as a vehicle to provide banking for the start up ABD. The

26  Court can not on the basis of this confusing record find that they fraudulently misrepresented their

27  DECISION

28  July 22, 2011                                          -23-

1 | income from, AA&S.

2 |     C. Statement of Monthly Net Income

3 |     Defendants' "Statement of Monthly Net Income" (¶ X 22 p.62) reflects that Marsha

4 | McMahon-Jones received no net income in the six months prior to the filing of bankruptcy. This is

5 | consistent with her testimony that she was working as a relator at the time and that she had no

6 | income. Tommy Jones, the joint debtor lists income of $24,141.16. The Debtors' SOFA reports

7 | gross income from AA&S of $16,476.69, and from Budget Blinds of $14,700.00. (¶ X 22 p.49).

8 | These figures are consistent with the evidence in the case and not fraudulent misstatements of the

9 | facts.

10 |     ABC has not proven that the Defendants have knowingly and fraudulently made a false oath

11 | in this case.

12 | **CONCLUSION**

13 |     The Plaintiff ABC has failed to meet its burden of proof that the Defendants Marsha

14 | McMahon-Jones and Tommy Jones violated the provisions of 11 U.S.C. § 523(a)(2),(4) and (6).

15 | Upon entry of a discharge in the Defendants' case, their obligations to ABC will be discharged.

16 |     The Plaintiff ABC has failed to meet is burden of proof that the Defendants Marsha

17 | McMahon-Jones and Tommy Jones violated the provisions of 11 U.S.C. § 727(a)(2)(A); § 727(a)(3);

18 | and § 727(a)(4)(A). The Defendants are entitled to a discharge in their case.

19 |     A judgment will be entered in this adversary proceeding in favor of the Defendants Marsha

20 | McMahon-Jones and Tommy Jones and dismissing Plaintiff's complaint.

21 |

22 |

23 |

24 |

25 |

26 |

27 | DECISION

28 | July 22, 2011               -24-

1       Pursuant to the terms of the Federal Rules of Bankruptcy Procedure, Rule 7052, and the F.R.

2 Civ. P. Rule 52, this written decision constitutes the findings of fact and conclusions of law in this

3 adversary proceeding.

4

5         Done this 22 Day of July, 2011

6

7

8       JOHN A. ROSSMEISSL
      BANKRUPTCY JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27 DECISION

28 July 22, 2011                 -25-